May it please the court, my name is John Norp. I'm with the Pennsylvania Attorney General's Court of Appeals, and I'm here to represent our Board of Funeral Directors and the other state officials who are the appellants in this matter. If I may, I'd like to reserve two minutes for rebuttal. Your Honor, this case is about the constitutionality of our funeral directorial law. Can I just ask you at the outset, what do you want here? Do you want a remand for additional fact-finding or what? Or do you want us to just to go the opposite way on the decisions that were given by Judge Jones, or what are you seeking? The latter, Judge Ambrose. We think that the district court's decision should be reversed and our act should be held to be constitutional. What is there in the record? It seems to me one of the things under the, one of the issues is the extent to which the industry is regulated. It certainly seemed to me that the funeral industry was regulated. I think it's almost the kind of thing we can take judicial notice of. Judge Jones disagreed this morning. I got up early to look at this again. I just Googled books on funeral directories and I can't tell you how many there are. There's associations in almost every state to guard against the kind of abuses that I think the record suggests that you're concerned with under this statute. But what is there in this record to suggest that this is the kind of regulated industry that would give rise to a kind of Berger administrative subpoena or administrative inspection? Well I think that's primarily a question of law, Your Honor, and I think that the statutory scheme here compares very favorably with the scheme in Berger. I mean, as in Berger, you have a requirement for licensure. The requirements here for licensure are even more extensive than in Berger because there are, of course, extensive educational and training requirements. There are, as in Berger, record-keeping requirements. There are, in addition, operational requirements in the statutory scheme and, of course, there is a requirement that the establishment submit to inspections. And all of that is the same as it was in Berger. So I don't think that there's any serious question that within the meaning of Berger this is a closely regulated industry. You know, Judge Ambrose asked the question that I was going to ask. Because sometimes these cross-motions with summary judgment, you can say, look, it's a dispute of fact. The court was right to deny it to one, it was wrong to grant it to the other, and we're just remanding it. But it occurred to me that the issues may be different. Maybe some of you, the way you presented it, it was like all or nothing. But isn't it possible that some of the issues would require a hearing and perhaps some don't? Why does it have to be all one way? Let me just – let me give you an example of that. Sure. On the dormant commerce clause, what evidence, what fact-finding is there that you could argue that discriminates against interstate commerce in its purpose or effect? And the other side might say there's a lot of fact – there's, you know, there's stuff in the record. But I'm not – I will tell you, I'm not finding it. And it seems to me on that one, you might argue, okay, you need a remand. Because there's a host of issues here, and they're not all dealt with the same, back to Judge Greenberg's point. Yeah, well, on the commerce clause, again, the district court and the plaintiffs for that matter approached this as a simple question of law. And as a matter of law, there is no discrimination against interstate commerce in any form. All of the provisions that are under attack apply equally, whether you're in-state or out-of-state. There simply is no discrimination against interstate commerce, and neither does the district court. I understand, but you can have something that's – It could operate in a way that is discriminatory. Yeah, how does it operate? Something might be neutral on its face, but does it operate in a way that discriminates against out-of-state interests? Well, sure, but that's not the claim here. I mean, they did have a chance. There was something like a 16,000-page record on summary judgment, and neither the district court nor the plaintiffs have ever pointed to anything that either on its face or in its practical effect discriminates against interstate commerce. But if there's motions for summary judgment, maybe there ought to be a hearing, though, because things can be developed at a hearing. Although I realize it was a pretty thorough briefing here and everything in the district court, but maybe things could be developed. I don't know. I just couldn't see why it was necessarily all one way. It's not like it's a one-issue case. Either the plaintiff's right or the defendant's right, and there's no argument about what happened, you know, once the facts are – that's – it's not – The food service requirement, for example. That strikes me as something that – in the corporation room, those are things that might suggest the need for some factual development as to what the impact is, and whether or not that impact – excuse me – is consistent with your suggestion that the statute is constitutional. Well, partly, of course, this is a function of the way the plaintiffs approached their case and the way the district court approached the case, which was to declare that the statute is invalid on its face. And when you have a facial challenge to a statute and a holding that it is invalid on its face, there are virtually no facts that become relevant because you've got to prove that the statute is unconstitutional under every conceivable circumstance. And that's exactly what the district court did here. But going back – With that – I'm sorry, Judge Ambrose. That's okay. Going back to the – for the – one of the first claims, the dormant commerce clause again, you would argue that there should be a pike balancing test, and they would argue there should be heightened scrutiny, I would assume. Is that correct? Yes. And so for you to get – for them to do that, back to the point that I said earlier, it would seem that they would have – that there would have to be some facts shown that the law discriminated against interstate commerce in its purpose or effect. That would seem to be a fact. And what I don't understand is why you're not saying, okay, fine, we need to go back, and on that particular issue, that needs a remand because there has to be – in order to apply the right test. This is – to me, when you look at this, to some extent it has similarities to Cloverland 1 in 2002. It went back, there was fact-finding, and then Cloverland 2 found that as a result of the fact-finding, there was no violation. Why is this not a similar means of analysis as was done in Cloverland 1? Well, let me first say that certainly from our point of view, a remand is better than an affirmance. I understand that. But our main point is that this case was submitted on an extensive factual record. The plaintiffs had the opportunity to make – bring out whatever facts they wanted to bring out, that in operation, this statute discriminates against interstate commerce, and they failed to do that. You know, even on its face, it's so facially neutral that there's no way just looking at the statute and the text that it could possibly treat – it could possibly burden interstate commerce. Was it really the interest of state commerce? Well, certainly that is true on its face, but it is also true as a matter of fact because there are no facts in the record that demonstrate any kind of a discriminatory impact. And under this Court's Norfolk Southern line of cases, even under Pike balancing, even the incidental burden must be a discriminatory burden, and there is simply no evidence whatsoever and virtually no claim even that this statute operates in any way differently depending on whether you are an in-state or out-of-state resident. What does the district court want you to do? Suppose we just wrote an opinion. We affirm. Okay. And now what are you – in other words, so now you just have the district court mandate. What are you supposed to be doing at this point according to the district court? Well, very little, I would think. There's very little left for us to do. What that would mean would be it would be a sea change in the whole regulatory scheme. If – when you take the rulings of the district court in combination, what it would permit is an entirely different business model than what our General Assembly thinks is appropriate. That is to say, you would have corporate ownership of large funeral chains without limitation to number. There would be no requirement that there be supervisors, no requirement that any given institution have a preparation room, and of course, there would be no inspections. And that would be – that is what the district court envisioned, I believe. And that is where we would be if you simply wrote a one-second per period of affirmance. Let's go – let's see if we can go through them one by one. I mentioned Dormant Commerce Clause. Is there anything further you want to add to what you've already stated with regard to that? No, I think I've covered that, Your Honor. How about the – I'll cluster the clustering provisions, the one-at-a-branch, the place of practice and full-time supervisor requirement, and the preparation room requirement. In other words, you keep things together. How would you – what are your arguments with regard to those as to what test we should use? Let's start with that. Well, those were attacked on a couple of different bases. One, of course, was the Commerce Clause, which we've already discussed. And if I can mention the clustering thing, that is the only – that is the only aspect of the statute which the plaintiffs claim discriminates against interstate commerce. And that's absurd. Clustering is the ability to have, I don't know, four or five or six funeral homes in the same area. And then you get economies of scale and all the rest of it. Well, to be a Commerce Clause problem, that prohibition against clustering has to have some connection to the out-of-state residence of the owners, and it can't. I mean, the ability to cluster has no nexus whatsoever with where the owner of the funeral home happens to reside. And that's what I mean when I say they had every opportunity to demonstrate that there was an interstate Commerce Clause problem here as a matter of fact or on its face, and there simply is none. I think their argument, essentially, with regard to clustering is that the penal director law, the anti-clustering provisions, impede entry of out-of-state firms into the Pennsylvania market. That's essentially it, as I understand it. Sure, that's the argument, but I don't see how that can be. It doesn't impede out-of-state firms any differently than it impedes in-state firms. It impedes them all. I'm sorry? It impedes them all. Yeah, yeah. It impedes everyone. Regardless of where the state line is. Sure. And whatever competitive advantages flow from clustering have nothing to do with whether the owner of the cluster is in Pennsylvania or out of Pennsylvania. Now, the other provisions you mentioned, the preparation room and the one on the branch and so forth. The place of business and having a supervisor on the branch. All of those were attacked both under the Commerce Clause, which we've dealt with, and under substantivity process. And perhaps I could move to substantivity process. Okay. This is, these are to be judged under the rational basis test. There is no more deferential test in constitutional law than the rational basis test. All that has to be shown, the law must be upheld if the legislature could have believed that a provision could advance a legitimate state interest. And I see no evidence in the District Court's opinion that the District Court even acknowledged, let alone applied, that extremely deferential standard. I'm not going to get through the whole thing. I had the feeling that the Court was annoyed at you. Not only you personally, but your client. I think that that is a fair assessment, Judge Greenberg. I had the same feeling. I mean, it was sort of an unusual way to write an opinion. I would agree with that as well. But isn't it, I remember, I can, I don't know why things pop into your mind, but 10 years ago, I remember reading an article that there was a national consolidation of funeral homes. And as a result of that time, people that owned individual homes were getting very good prices. I remember somebody said, listen, we better sell, you know, while the market's hot. And is that true? Is there a national consolidation? I don't know if that's true or not. That is certainly the business model that the plaintiffs, in this case, want to follow. But that's not the business model. No, the one that's always given as the example is the Loewen, for example. I'm sorry? L-O-E-W-E-N, I think, Loewen Funeral Homes. Right. They're all over the country and in Canada. I think it started in Canada. Sure. Do places, can an entity like that own funeral homes in Pennsylvania? Yes, but it can only own one. And if it is a corporate entity, which I assume it is, it can only do that by buying the license of one of what we call the pre-1935 corporations. Okay. Because other than that, licenses are only available to individuals and professional corporations and so forth. I see the red light as I'll, of course, continue as long as you'd like to hear me, Your Honors. What about the restriction on alienation upon the death of the owner? How is that, what is the justification for that? It can go to the spouse, but there's some very real restrictions on that. It can't simply be sold outright. Why is that? I'm sorry, I didn't quite get the question, did you, McKee? The alienation limitations on the alienation of a funeral home. Right. Upon the death of the owner. The estate can run over three years, but the spouse, there's no limit on the spouse. Is that correct? What is the justification for that? Well, that whole provision is an example of the balancing of different interests. We have, on the one hand, the legislature's desire that funeral homes be in the hands of licensed professionals for, I think, a variety of obvious reasons, having to do with quality of service and professionalism and all the rest of it. But there is also a competing, if you will, interest on the part of the family of a deceased funeral director who may have a significant financial interest, because that may be their sole source of support. And there is also an interest on the part of consumers and the community in general in continuity of services. Wouldn't the same thing be true of barbershops and car repair shops? I've never seen a provision like that before. What is so unique to this industry, which certainly does appear to be a very unique industry, but what is it about this industry that gives rise to a rational basis for having that kind of restriction, as opposed to a beauty salon, a grocery store, liquor store outside Pennsylvania? Pennsylvania individuals can't yet own liquor stores. What is so unique about Funeral Brothers? Well, I don't know that the General Assembly has to find that there is anything unique. It only has to be rationally advancing a legitimate state interest. And the interests here are, as I've just described, you have a balancing of the need for licensure against the other interests of the family and the community when a funeral director dies. And under rational basis review, that is enough. That is all that there has to be. And that is, I think, precisely the kind of deference that the District Court failed to show to the various judgments made by the General Assembly. Let me go back to... Just one question. Go ahead, Mark. Is it contemplated that within the three years, the widow or widower will sell the business? Or what's contemplated that would happen? Because there is only three years. Well, that's certainly one possibility, so that the widow or widower at that point has an ongoing business that they can sell, as opposed to, you know, the funeral director dies and the business can't be carried on, so it is essentially worth nothing at that point. It is bizarre. I'm not saying it's irrational, but it is bizarre. Well, I don't know that I would agree with that. Well, of course you wouldn't. But it just strikes me as bizarre. It may be unusual. Well, frankly, I have not checked to see if there are similar kinds of provisions involving other licensed professions, but I can tell you that Maryland has a very similar provision in their funeral director's law, which the Fourth Circuit, of course, upheld in the Brown case against both Commerce Clause and substantivity process challenges. All right. Let me go back to one issue we've talked about a little bit and then two others we haven't. On the administrative searches, yep, Berger is the court case that you look to of the Supreme Court, and it gives, you know, there's a substantial government interest and warrantless inspections must be necessary to further the regulatory scheme and it must advise the owner of the commercial premises the searches being made are similar to law, et cetera. But what you have here are searches that are limitless in terms of time and scope and place. Doesn't that go too far? Well, I don't agree with your premise, Judge Ambrose. You don't think it's limitless? Oh, no, not at all. How so? The statute specifically provides that the inspections are only to be of places where the business of funeral directing is carried on. They are only for the purpose of inspecting for the enforcement of the act. Now, I grant you there is nothing in the statute specifically that limits the time during which these searches can happen, say, to normal business hours, but, in fact, that is the only time they are carried out and there is no contention to the contrary. Maybe I should say that they're nearly limitless. I mean, the way the statute reads, they can be done at midnight, right? I suppose as far as the statute is concerned, they could be, but they have not been. There is no evidence that they have ever been. And as a matter of fact, my friend Mr. Kutz points out well, he says, that's because you're having them carried out by civil servants. Well, of course. That just goes to show you that there is a structural limitation inherent in the nature of government itself that tends to limit when these things can be carried out. Well, the place might be locked up and nobody there at 2 in the morning if somebody wanted to. No living persons there. Well, the record doesn't show that that's ever happened, so I suppose we wouldn't know. But sure. But there is no contention that there has ever been any attempt to inspect places at 2 o'clock in the morning or at any time outside of normal business hours. Dustin, what goes on after business hours may well be pertinent to the purpose of the statute. The extent of the refrigeration, if the refrigeration is cut off at 5 o'clock to save money and utilities, that kind of thing would be relevant to the regulatory scheme to find that out. And it's certainly consistent with the health concerns that purportedly drive this statute. If it were meat inspection in that place, for example, I'm not sure there would be a rational reason to limit the inspection to normal business hours. You might find out more in terms of the purpose of the inspection to go in when it's least likely that they would suspect you going in. You might have a much more revealing inspection that way. I don't know. Well, I suppose you might, but as a matter of fact, that's not how we do it. What about the restriction on the use of trade names? What's the rational basis for that? Well, it's not really a question of a rational basis, Your Honor. What's the reason for that? That is a First Amendment challenge. Okay, what's the reason for that? Well, the reason for it essentially is to- I realize it's a Central Hudson test. I understand what the test is. But when you have that restriction, what's the reasoning for that? Well, it's essentially a consumer protection measure to prevent the deceptive use of names. And it is our submission that this provision is on all fours with the statute that was upheld in the Friedman case by the Supreme Court. Well, Friedman was a year before Central Hudson. The Second Circuit has stated that there's a real question as to whether Friedman is to be followed anymore in light of the fact that Central Hudson comes later. Central Hudson is indeed a year later, but Friedman is directly on point. And with all due respect to the Second Circuit, I think that their approach is contrary to what the Supreme Court has told the lower courts in that kind of a situation, that the courts of appeal should wait until the Supreme Court overrules its own decisions when something is directly on point and not jump the gun because they think that later decisions may have undermined it. And I should mention also that Central Hudson itself favorably mentions Friedman three times. So I don't think there's much to the idea that Friedman's been undermined by later decisions. Well, Friedman doesn't hurt you in any way, does he? No, Friedman doesn't hurt him. I mean, the point is that Central Hudson lays out the test that is a fuller test than what was used in Friedman. I mean, whether the expression is protected by the First Amendment, you must concern lawful activity, not be misleading, whether the asserted governmental interest is substantial, whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve the interest. The concern here is the fourth one, is couldn't you have more narrowly tailored means of getting out the information that is sought with regard to the restriction on use of trade names? To be saying it should not be misleading, that's the purpose. And the fourth prong of Central Hudson would suggest that's where the focus should be, that it not be a misleading name. Well, I'm not sure that a simple directive that a name not be, quote, misleading gives a lot more guidance than a- Well, I mean- At least has the virtue of certainty if you say you can't use trade names. And let me point out that Friedman, of course, didn't apply the Central Hudson test in so many words because it didn't exist then. But if you go through Friedman, as we did in our brief, many of the same concepts apply. And on the last point that Judge Ambrose raised, the Friedman court remarked that the restriction on speech is purely incidental. So it's hard for me to see how it could be more extensive than necessary under the later Central Hudson test. What about- go ahead, go ahead, Mark. But couldn't you do more narrowly restricted with regard to trade names? I mean, for example, you could- you have the name- okay. Tell me how it works in practice. Is this what- say Smith Funeral Home? Is that what they would say? Yeah, sure. Okay. And Smith has a- he dies and the wife sells to someone else. Mm-hmm. They can still call it- can they still call it Smith Funeral Home? Yes, they can use the name of the predecessor. Yes, sir. And so what do they do to let the public know who now- who's now involved? They also have to have the name of the current owner on their advertising business cards and so forth. And signs. Mm-hmm. Okay. All right. What about the payment of commissions to unlicensed salespeople? This, again, is a First Amendment challenge. We think that it's obvious that a commission scheme creates an incentive to sell and possibly to oversell to customers who are uniquely vulnerable, and therefore it is reasonable for the state to say you can't pay your salespeople that way. And we have cited the cases involving the use of paid petition circulators. And three courts of appeals have said, yeah, you have a First Amendment right to have your petition circulators paid, but you can't pay them per signature. You can't use a commission-like scheme. Now, it seems to us circulating a political petition is core political speech. If you can ban commissions in the area of core political speech, you can certainly ban them in the context of commercial speech. And, again, the tie to the First Amendment here is pretty tenuous. This is at most, it seems to me, an incidental restriction on whatever First Amendment interest is at issue here. Thank you, Mr. Norris. Thank you, Your Honor. How much time does you reserve for rebuttal? Two minutes. Well, two minutes. I'm long over my time. Well, that's no problem. Your Honors, good morning. May it please the Court, my name is James Kutz, and I am here on behalf of the 30 plaintiffs that were successful in the conclusion of a five-year pre-submission of summary judgment litigation that involved a host of depositions, 50 in number. When you say conclusion, the fat lady hasn't signed yet. It's not really over. My good friend, Mr. Norris, has done an excellent job of ignoring the record that was developed in this case. Nobody came here on a summary disposition. And understand, we were also limited in pagination on our brief, sought to explain the facts. With the greatest respect, this Court denied a request for pagination increase, so we're somewhat limited with 11 claims and the pagination or word limitation that exists. But as an initial point, if I could, let me make three or four points, and I presume the Court would indulge me for some of the fact-specific, issue-specific colloquy that went on with Mr. Norris. I had originally drafted my thoughts thinking I'd be bound by my amber and then red light. But most importantly, this case, and the reason Mr. Norris, to his credit, suggested this, this case has been factually developed. If you look at Volume 9. Let me ask you one question at the outset. Yes, sir. Assuming that the funeral director law provisions are facially neutral, what competitive advantage is being excluded that's out of state? Understanding I don't concede the facial neutrality, and I will get to that point why. The out-of-state ability that is lost, the competitive edge, the language that Your Honor utilized in Cloverland II in particular, it is the ability to be in the funeral industry, to have multiple facilities, to have the ability to move your licensed employees around, to, quote, cover for other funeral directors, to be available 24 hours, to utilize economies of scale whereby the centralized preparation room can be put into play. If you have five facilities and you have to build five preparation rooms, and, for example, the facts of this case demonstrate that many, many funeral homes don't use their own preparation room. They just don't do it because they have utilization or contract services done elsewhere. How does that impact outside, people out of state, more than it impacts people inside the state of Pennsylvania? Because the barriers constructed by Pennsylvania's brick-growing, brick-laying scheme of restriction and prohibition eliminates the ability to cluster. It eliminates the ability to have multiple ownership. It eliminates the ability to have an individual work at more. The current law, funeral director law, limits a funeral director to working at one place of business. I have clients out of state. I have a client by the name of Wellman in this matter that is a Louisiana, Texas entity that has funeral homes and utilizes the economies of employees between and among its facilities. Going back to the Smith name that we used before, if Mr. or Mrs. Smith resided in, say, Harrisburg and was in the funeral industry, he or she would have exactly the same limitation, would not be able to operate under the economy of scale that may be better in terms of the ideal business model, would have the same limitation in terms of having a preparation room centralized, would have exactly the same, if you want to call it that, onerous business conditions impressed upon him or her as your client in Louisiana. How is it different? Well, I think conceptually you start with the argument that if Pennsylvania law applies evenly to everyone, then there is no discrimination. If the impact or effect is the same on everyone. It's not, and I really want to get to that point because there is a major misperception on how the funeral profession operates within this state. But under Commerce Clause analysis, if out-of-state interests are able to utilize that, I think the word is competitive advantage from Cloverland, and they are restricted from that competitive advantage in another state, that is a Commerce Clause violation. That's no different than you can run double bottom trailers in 49 states. But when you come to Pennsylvania, everybody has to detach their double bottoms. They're all treated the same, so there's no discrimination. Or mudflaps. Anybody coming through Pennsylvania has to put on those mudflaps. The heart and soul of the- The effect there is different. The impact is very different there from someone who is inside the state versus someone who is outside the state. But, Your Honor, there's no dispute that the funeral industry is engaged in interstate commerce. Indeed, the Federal Trade Commission wouldn't be breathing down the industry's neck for the last 40 years if there weren't trade issues that affect interstate commerce. The one issue in this case that I think cries out for facial invalidity under the Commerce Clause is a statutory scheme that prohibits my client from owning a funeral home in Pennsylvania, but allows wife, children, and grandchildren to own corporate stock called a restricted business corporation, and thereby own a home without any education, training, or good moral character. It's right in the law. But it's only available if you are the wife, child, or grandchild of a Pennsylvania funeral director as opposed to an Ohio director or an out-of-state corporation. So when my friend says, we're treating everybody the same, they're not. Pennsylvania bloodlines can set up a restricted business corporation and have a funeral home. My out-of-state corporation cannot. That's the heart and soul. But the Ohio funeral director who wants to come into Pennsylvania, you're saying his advantage, as I understand it, is being free of the Pennsylvania law. And that Pennsylvania law applies to everyone, including people in Pennsylvania, as well as outside entities or persons wanting to come in. Not the ownership scheme, Your Honor, no. The ownership scheme is unique. There is 48 states in the country have no ownership. My client cannot, my corporate client cannot. Well, you're talking about the spouse. Not only spouse. Spouse, children, and grandchildren. I understand that. But the point is that this law, if the out-of-state entity or person wants to come in, there's no prohibition against that person coming in, provided that the person then is limited to one and a branch, correct? No, sir. No, sir? That person cannot come in at all. That was not my understanding. No, let me explain. So your answer is different than what his is? Absolutely, sir. Why is that? If I have an out-of-state funeral director, he or she or it, if it's a corporation, and by the way, if it's a corporation, it cannot come in and get a funeral home, but for sleight of hand or hook and crook. And I want to get into that because that's what this record develops, Judge Ambrose. My Ohio State funeral director and his children and his wife cannot own a funeral home in this case unless, here's the limits, when Pennsylvania changed the law in 1935, they essentially grandfathered an old concept of corporations. Right. There are 51 with licenses, and the record is abundantly clear that it is, if anything, hazy as to how any of those other licenses could be activated. So I need to pay a tariff. I need to find Joe Smith, who is holding a pre-35 license. That doesn't require the licensed funeral director. Pay a tariff, and the record shows that price is about $100,000 to $200,000. And if I can find that person, and if I find it at a location where I want to have that home, yes, I could come in. But you talk about an impediment and a differential treatment. I shouldn't have to pay that price compared to the facial permission given to children and grandchildren who hold R.B. stock with no education. And practically, practically what has occurred is funeral directors licensed in Pennsylvania have been able to obtain ownership in multiple homes in this state by putting one home in the name of a spouse, a second home in the name of the spouse, a third home in the name of the child, a fourth home in the name of a grandchild. That is what the record shows in this case. The question I asked board counsel... So could somebody from Ohio have a relative going to live in Pennsylvania and then getting a home? No. What I'm saying is unless you are born or married into the Pennsylvania licensed funeral director, the exception does not exist. Is there a limit to the number of funeral homes that one can have in the Commonwealth? There is a limit of one home in a branch stated in the law. No, no, no. I mean, is there a limit to the number of funeral homes that one can have in the Commonwealth of Pennsylvania? Not for any individual, but an aggregate limit. You mean does the state have a limit? Right. Is there a max? No. So if somebody wants to set up another, say there's a population expansion in a particular area of the Commonwealth, then you could set up a funeral home in that area, correct? Sure. And is that limited only to PA entities or persons, persons setting it up, or could an out-of-stater come in and do that? An out-of-stater cannot come in and do it because they cannot get a license. Why can't they get a license? As the facts and the law were developed in this very significant record, the first way is the way I told Your Honor. Arguably, they can do it. Conceptually, there's a possibility if there is a pre-35 license sitting around and someone wants to sell it, they can pay that tariff, pay that premium, and utilize that. Other than that. That's as a corporate entity, a business entity. That's if you're a licensed funeral director in Ohio. An individual? It doesn't matter. It doesn't matter. The Pennsylvania funeral director, through the use of the exception for the spouse and the children and the grandchildren, can have or control as many homes as he or she would like. I would like to call the Court's attention to page 1146 of the record. It is a letter from Board Counsel to a member of the General Assembly. The question posed, gentlemen, was, I have constituents that would like to have ownership in three homes. Can I do that? And the answer is, not directly. However, the funeral director law does not prohibit members of a funeral director's immediate family from having a property interest in more than one restricted business corporation. So the answer is, do you understand the Board will allow funeral directors licensed in this state to utilize their children, grandchildren, and wives to secure multiple homes? One of my plaintiffs in this case has a wife owning several homes in this state, but he himself can only own a home and a branch. It makes no sense. It's preferential in treatment, and it's discrimination on its face. The other provision that exists, which I haven't even gotten to, in which the record is abundant on, is something which we have now identified as the Pinkerton Rule. What we learned is the chairman of the State Board of Funeral Directors owned a home in Pittsburgh under the name of his father. What he did was he sold all the assets to an out-of-state corporation. He remained of record as the straw man owner of the restricted business corporation, and in the same breath issued an irrevocable proxy to the out-of-state corporation. Is that what an outfit like Lowen does? It's exactly what an outfit like Lowen does, and in this case it's exactly what Service Corporation International does. If you go to the 10-K of Service Corporation International, you will see that they will tell you they own 23 homes in Pennsylvania by using this process that board counsel said was proper on page 1146. So my clients that don't have the pocket of Lowen, that don't have the pocket of SCI, that can pay a premium for a straw person funeral director, there is a confidential volume in the appendix dealing entirely with board member Pinkerton and how he sold his home to a non-licensed entity but remained of record essentially with all candidates in court committing a fraud as to who was the owner of that funeral home. Because on the record he is the stockholder, but in the paper he has assigned all assets and all voting rights and indeed factually isn't involved in the operation. A scheme that allows that kind of juggling of legalese, a scheme that prohibits my company Wellman in Louisiana and Texas from coming into Pennsylvania but allows Pennsylvania funeral directors to use their blood or their wife to establish multiple homes. That's discrimination in effect, Your Honors. You said that, but this case involves numerous issues. Yes. And the issue we raised originally was they don't all have to come out the same way. In other words, it doesn't all have to come for the plaintiff or the defendant. Some issues might be going one way, some another. Well, in this particular case, we lost one of the issues in the trial court dealing with the control over cremation. But the difference in this case from most cases I've been involved in, I'm not an old man, but it's been 30 years of litigation in this area, is that this record is not a record of dispute. The facts are primarily admissions from the lips of the board or the General Assembly or audit committees or proposed legislative initiatives. When the State Board defendants say in a legislative initiative in 2009, when they say this, that there is no need for a requirement of a preparation room in every facility. It is not needed to protect the public. It increases costs, and we ask that the statute be repealed. I can't get better evidence than that. Isn't there a disclaimer on that evidence, that that is not necessarily the opinion of the committee or the State Legislature? Oh, you're talking about the Audit Committee of 1994? Is that what you're referring to, the Audit Committee? The Audit Committee said that it was a product of the staff, but it went to a public hearing, and the State Board of Funeral Directors were permitted to comment. In this record, the State Board went on record unanimously and indicated that they agreed with the report in all regards. In fact, at page 911 of the record, there is a record here. There is a factual record. The report is well-written, well-documented, offers recommendations we believe are greatly needed in the Commonwealth. Board Chair, we agree with the committee. The statute is way outdated and serving a particular group of people more than the general public. But no matter what the record, and you told us that we know the hard way about the size of the record. All right. We don't have to be told about that. The fact is that this is an appeal from a summary judgment, isn't it? So there's a standard of review. And no matter how big the record is, you can always get different findings after a trial. Let me indicate to you that that's not even what the Attorney General is telling you. I know, but the Attorney General is sitting there. We're sitting here. And we have to decide. And what I am suggesting is that if you look at the record developed, the Middle District requires under local rule that you set forth clear and concise every material fact that you believe is not in dispute. We did that in Volume 9. It is 725 facts. No response that raised a genuine issue was asserted. They are the facts. Your job, admittedly, I believe is somewhere between de novo or plenary, and I think that's actually the same term here. You look at the record below to determine what facts could exist. When I have a State Board that acknowledges nine of my 11 claims, I submit there is no need for a remand. When the State drafts a regulation, the defendants I've sued, that says, we wish to repeal the prohibition on serving food in a funeral home because there is no reason for a prohibition, what are you remanding for? When they say there is no need for a preparation room in every facility, I can't prove any more. When they say requiring a supervisor to work at one location only is economically unfeasible in certain instances and should be vacated, should be repealed, I can't give your honors better information. The trial court would have to ignore those admissions. When I have a fictitious name rule that inexplicably is appealed that allows a funeral home to operate under the name of a prior owner who hasn't been affiliated with the facility in 50 years but would prohibit my client from branding something like Life Tributes Funeral Home or my lead plaintiff, Mr. Hefner, from having three funeral homes with the name Hefner in it. You haven't made any of the prongs of the commercial speech in Central Hudson. Not one. When I have a prohibition facially in the law that says I cannot pay any gratuity or the regulation is worse, I cannot pay any valuable consideration to anyone who helps me market business. And the state says... With or without a license, is that right? Pardon me, your honor? The questions before were in terms of a license, but it's with or without a license, the restriction on commissions as I read it. Is that incorrect? With the greatest respect, Mr. Knorr, very good advocate, he rewrote what we challenged. He rewrote and said the problem we have is with the commission component of that. That's not what the statute says, and that's not what the regulation duly promulgated says. It says my clients can't pay any valuable consideration. I challenge facially a statute that bars that. If Mr. Knorr was defending a statute that said commissions based on percentage of dollars received, we might have a dialogue at a different level. That might be a factual question. I facially challenge a statute that said you can't pay anything. It's the same problem with the Fourth Amendment. But isn't your primary argument that somehow there are restrictions keeping people out of Pennsylvania? Yes, sir. And you actually clustered the cluster issue in your question to Mr. Knorr, which is prohibiting the number of homes that you can have, prohibiting individuals from working at more than one place of business, requiring that you build a preparation room even if it's not needed or used. As the evidence shows, board members acknowledged on their record in deposition, I never used my one-prep room. What we're suggesting is there was a record developed there, and clearly. And by the way, the state never disputes, Your Honor, in economies of scale. They never dispute the evidence we put in that showed there is a value to clustering because with the greatest of respect, it is self-evident. If you only have two preparation rooms instead of five for the five homes, Your Honor. Go ahead. If you have, are you arguing that the exception for family members under the law violates the Dormant Commerce Clause? Yes, sir. Are you arguing it because the family members are simply more likely to be from Pennsylvania or what? Let's say a son or grandchild doesn't live in Pennsylvania but lives in California. Are they prohibited from coming in under the exception? No. No. But the record in this case shows that 11 of the 1,700 funeral homes are typically mom-and-pop operations where the family lives above. And remember, there is no requirement on majority. How does allowing family members to own shares in a restricted business corporation place a burden on interstate commerce, for example? It allows in-state interests to advance their business. I thought the district court found that there was a burden in the licensing requirements themselves, but that seems to be unrelated. Well, I think that's what we're – you're saying that the licensing requirement is unrelated. I think the burden on interstate commerce is that it favors in-state interests to the exclusion. Burden is an interesting word here, Your Honor. We're not – when we talk about only working at one place of business requiring a prep room in every facility, they are economic albatrosses that are laid on the back of the individual wishing to come in. But we have a threshold issue. We have a bar, not a burden. It's a bar and a differential bar. One can come in and have as many licenses as they want, the Pennsylvania kids and grandkids and wives. But when I step back and I keep trying to – what's the biggest argument you have? Initially, I thought, well, maybe it was because of the expert you had, Bowman, saying that the cost of funerals in Pennsylvania is about $550 higher than it is for comparable out-of-state places. Correct. And then I thought – then it seemed like, no, what you're really saying is there are impediments to others coming in, and those impediments, they favor Pennsylvania persons and entities and disfavor out-of-state persons and entities. And the reason for that is based on this record – based on the amicus of PFDA, if you have a single funeral home and you want to operate as a single funeral home with a prep room, with one employee at one place of business, this statute grossly favors that model, which protects exactly the interests of the amicus in particular that have fought against the lifting of any of these barriers. My clients are barred from coming – not barred, but they are not able to take advantage of what they take advantage of in every other state. This statute was drafted in what, in 1951? 1951, Your Honor. And what do you think the purpose of the legislature was when it was drafted in 1951? It dealt primarily with concerns of disease and health. Okay. And also that you need to know who it is in your town that's operating the funeral home, and you don't want people getting too thin because it goes back to health concerns at that point in time. At a time in 1951 when we thought a dead body posed a threat of harm, a fact now undisputed in this record, far more danger at a lunch counter than it is disposing of a dead body. In interrogatories, if I have a duty to disprove these rational arguments imputed of local benefits, I can do no more than to pose the defendants, Your Honors, and ask questions. The first answer is, well, it's not a burden on interstate commerce because funeral directing is not interstate commerce. If you look at – Well, that's what Brown said in the Fourth Circuit case. That's what Brown said. But if anything, Brown dealt with the question of whether or not corporate ownership at any level, that's all it was, can corporations own funeral homes? Unless they want to spend a lot of time on that issue. That's not really – I understand. But when you have an interrogatory answer that says the purpose is having a local business owned by local people, that is legitimate. If that is the theory, Your Honors, then I cannot prove a dormant Commerce Clause claim. That is the purpose. It is discriminatory. It protects what's in place here. And I believe at least facially, at least facially, a statute that allows uneducated and untrained Pennsylvania kids and grandkids, minors and infants in trusts based upon a Pennsylvania funeral director licensed bloodline and barring competent out-of-state competition, coupled with the fact that in operation you can own as many companies as you want as long as you own the assets. And I highlighted to the Court Board Counsel's letter that said that. Two ways to do it. Have your family members own more homes or go buy the assets and lease them back as Chairman Pinkerton did. Now, under the Pinkerton rule, how is it relevant for rational basis analysis that people have circumvented the one-and-a-branch limitation? If the law permits that, if the law permits it, then your argument doesn't work. If, in fact, as Board Counsel says – No, my point is how is it relevant for rational basis constitutional analysis that people have, through the Pinkerton rule, circumvented this particular one-and-a-branch limitation in Pennsylvania? It seems like an in-state type of way around, and that really needs to be dealt with by the Board, does it not? To the contrary, it is the Board has said that's the way to do it. And Pinkerton's not the only one to do it. SCI owns 23 homes in this state for a reason. That goes back to my point. I mean, is this really up to us or whether the Pinkerton rule is – in other words, if there is an exception, the Pinkerton exception allowed to the one-and-a-branch, isn't that really up to the Board to say yay or nay, it sounds like they've said yay, versus coming to us and saying that it violates the Constitution? What I'm saying is it undercuts the reason, the accountability not being spread too thin, requiring licensure. One of the final things I'd like to note for this Court is every one of these arguments about accountability is undercut by a memorandum of understanding that the Board entered into in December. But the problem is that clever people have found ways around the prohibitions in the statute. And that sounds like a question for the Pennsylvania Supreme Court, if you don't like what the Board's done. It may not mean so much that it's unconstitutional as it is very imperfect because it allows for these devious, if you will – I know you wouldn't agree with that adjective – it allows for these creative ways of getting around the restrictions that they've tried to put into the law. But there's nothing devious about expressly stating in a statute, you can form a business corporation and name your kids or grandkids if they're born into your blood. But out-of-state interests cannot take advantage of that. Well, what if the kids are out-of-state? There's nothing creative about that yet. That's facial invalidity. That is discrimination, and it's discrimination at its worst. The statute doesn't say out-of-state in the statute, though. Back to my point. By exclusion – let's put it this way. By inclusion of what it does permit, it only grants one exception. This is not a scheme that requires ownership of licensed, trained funeral directors. It starts with that premise. That's how the Attorney General framed the question on page two of his brief. But if you look at the record in this case of the 1,700 funeral homes, nearly 800 are restricted business corporations. Licensure as a funeral director is not what's occurred. That's why I needed to develop a record. That's why that record says that. And we have cited that in our brief. Seven to 800 are restricted business corporations. That's not anecdotal. It's not something that just happened. It's a model that allows preferential treatment for in-state licensees. And when you add the other prohibitions that go into how a mom and pop would operate, they're not affected by any of those. So it helps in-state interests if you only have one home and one employee. But it does impede the ability of my client to come across state lines. If you struck down the ownership requirement, it still makes it difficult on my client to use its competitive advantage under a record that says these economies of scale do help. What evidence did you have that your clients, the out-of-state entities, or clients have the ability to achieve the economies of scale? The deposition in the testimony of Robert Lomason, who's the owner of Wellman. It's right in the record. He explained what he does in Louisiana, what he does in Texas. He owns homes in both states, and he moves people around, and he secures economies of scale. And the reason I can't provide any more evidence of it and its impact, Judge, is because I not only have those barriers that prohibit me from using the economies of scale, I have that preceding threshold barrier of I can't even get into this state to get you empirical evidence to show how I'm being hammered. I thank the Court. Let me first say that I very much appreciate, and I'm sure Mr. Kutz does as well, your indulgence to us in a matter of time. Possibly I misheard what my friend said, or possibly he misunderstood the question, but I understood him to say that a person out-of-state, say a man living in Ohio or a woman living in Ohio, could not get a Pennsylvania license as a funeral director. That is categorically untrue. I refer you to Sections 3 and 9 of the Act. If you're living in Ohio or West Virginia or New Jersey, you want to open a funeral home in Pennsylvania. If you meet the requirements of the Act, you can get a license. Can you get a license as a funeral director even if you don't own anything? For example, somebody can become a lawyer. They may not have any office or do anything with it. Can you become a licensed funeral director in sort of an inert way? Or do you have to say, no, this is where I'm going to have my business? In other words, if you take the bar, you just take the bar, and you may never have anything to do with practicing law. You know, that is a question that I hadn't thought about before. I believe that the answer to your question is that it's not necessary that you actually own a funeral home yourself because, as I recall on the record, there are several of the plaintiffs who are licensed funeral directors who work for others. And I suppose if you wanted to, you could get a funeral director's license and just not do anything with it. I don't know of anything that would prohibit that. But let's say that you live in Ohio or across the river in New Jersey. Well, if that's true, then people from other states could go get licenses in Pennsylvania. Oh, sure. Oh, sure. And they can open up. Sure. And there is, as Judge Ambrose asked, there is no statewide limit on the number of funeral homes or the number of licenses we can issue. And what I wanted to say was if you... One question on three, on the licenses. I'm looking at Section 479.3C2. It says each applicant shall have successfully completed two years of academic work at a college or university accredited by the Department of Education. Does that mean the Department of Education of Pennsylvania? Yes, I assume so. What if it's the Department of Education of Ohio? Let's say a person has gone to Ohio State. I don't know the answer to that question, Judge Ambrose. There's nothing in the record on it. Because that would seem to be that you have to have gone... To a Pennsylvania school. To a PA school. That might be hard to justify because it's not like, well, the law is different from Ohio to Pennsylvania, and you ought to be able to pass the Pennsylvania bar. You ought to be in Pennsylvania. Now, I don't know. Maybe laws are different, you know, in the funeral profession from state to state, and procedures are different. I just don't know. It would surprise me the kind of thing you think would be the same anywhere. I would think that the practical aspects of funeral directing are the same everywhere. I'm sure that the legal regimes are different from state to state. That's an issue, Judge Ambrose, that simply hasn't come up in the case. I don't know the answer to it, and I don't know how far afield the Department of Education ranges in accrediting institutions. And what does Section 9 say? It talks about licensees under prior laws and from other states. In essence, what does that provide? The licensees under prior laws, that's the pre-1935 corporations, and it simply provides that they're licensees. And from other states, that's in... Yeah, the other state provision authorizes reciprocity agreements between Pennsylvania and other states. And what does that mean? Well, it means that if you're licensed, say, in Ohio, and if Ohio and Pennsylvania reach an agreement to recognize each other's licenses, then that's what happens. And does it do it? I don't think that there's... I don't believe that there's anything in the record that indicates whether there actually are such agreements or not. So... That wouldn't be true for lawyers. I think some states would, if you're admitted somewhere else. Sure. Some states won't. Sure. So if a person from Ohio or Louisiana wants to come in, what do they have to do to go about getting a license to be a mortician in the state of... or a funeral director in the Commonwealth of Pennsylvania? They apply for a license. I don't believe that there is an actual examination. They would have to demonstrate that they meet the training and education requirements and pay the fee and get their license. Once having gotten the license, all of these various stratagems that Mr. Coates was talking about, about allowing the children and the grandchildren to have an ownership share, all of those are equally applicable to you no matter where you live, if you have a license. And, of course, as Edith Amber asked, if the child happens to live in Colorado, that's not a problem. There is no in-state versus out-of-state distinction drawn by the statute. Okay. I would like to get a transcript. Thank you very much for the argument. Very helpful argument. Very professionally lawyered on both sides. Mr. Norton, Mr. Coates, thank you very much for your work on this case. Thank you, Your Honor. And could you see Ms. Brisk about how we go about getting a transcript for the proceedings? And why don't you just take a brief break while...